# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs February 27, 2018

## STATE OF TENNESSEE v. MONICA LEIGH-ANN BRIGGS

**Appeal from the Criminal Court for Campbell County**
**No. 16701      E. Shayne Sexton, Judge**

_____

## No. E2017-01025-CCA-R3-CD
_____

The Defendant, Monica Leigh-Ann Briggs, was convicted by a Campbell County Criminal Court jury of first degree murder and second degree murder. *See* T.C.A. §§ 39-13-202 (2014) (first degree murder), 39-13-210 (2014) (second degree murder). The trial court merged the convictions and sentenced the Defendant to life imprisonment. On appeal, the Defendant contends that (1) the trial court erred in denying her motion to suppress her pretrial statement, (2) the evidence is insufficient to support her convictions, (3) the trial court erred by not requiring the State to make an election of the offenses, (4) the trial court erred in denying her motion for a bill of particulars, (5) the trial court erred in admitting an exhibit depicting a Facebook page, (6) the trial court erred in admitting a "ledger" found in the victim's wallet, (7) the trial court erred during jury instructions, and (8) due process requires relief due to the existence of cumulative error. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Leif E. Jeffers, Jr., District Public Defender, and Tina L. Sloan and William C. Jones, Assistant Public Defenders, for the appellant, Monica Leigh-Ann Briggs.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Jared R. Effler, District Attorney General; and Thomas E. Barclay and Lindsey Cadle, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to the September 7, 2014 homicide of Kenneth Koster in a tool shed in Campbell County. The Defendant and Brad Phillips fatally shot the victim and fled to Sevier County, where Mr. Phillips was killed by police officers, and the Defendant was arrested for public intoxication. The Defendant was later indicted for one count of first degree premeditated murder and one count of first degree felony murder.

## Motion to Suppress Hearing

The Defendant filed a motion to suppress her pretrial statement, which she provided the day after being arrested for public intoxication. At the motion to suppress hearing, trial counsel stated that the Defendant and Mr. Phillips were located by the police at a Wendy's restaurant in Pigeon Forge and that Mr. Phillips was killed by police officers. Counsel said that the Defendant was arrested for public intoxication by a Pigeon Forge police officer, that she was held in the Sevier County jail without bail, and that being held without bail violated the Defendant's constitutional rights.

Trial counsel argued that the arrest warrant stated that the Pigeon Forge police officer encountered the Defendant at Wendy's, that the Defendant had watery eyes, that shet could not answer his questions, that the officer believed she was intoxicated, and that it was necessary to arrest her for her own safety. Counsel stated that the arrest warrant did not include facts relative to the officer's killing Mr. Phillips and that "the officer misled a magistrate and committed fraud by leaving out material facts." Counsel argued that the Defendant was illegally arrested and held without bond and that the Defendant's statement should be suppressed as fruit of the poisonous tree.

Tennessee Bureau of Investigation (TBI) Special Agent James Brandon Elkins testified that on September 8, 2014, he went to the home of Sandra Raines, Mr. Phillips's mother, to investigate a homicide. Agent Elkins stated that Ms. Raines called the police after finding a dead body on her property. Agent Elkins said that based on the investigation, the Defendant and Mr. Phillips were suspects in the homicide and that the police began searching for them. Agent Elkins stated that Ms. Raines viewed a Facebook photograph depicting the Defendant and Mr. Phillips, that Agent Elkins believed it was taken at Wendy's, and that police officers found them in a Pigeon Forge Wendy's. Agent Elkins said that Mr. Phillips was killed when officers attempted to apprehend Mr. Phillips and that the Defendant was arrested.

Agent Elkins testified that he saw the Defendant sitting outside Wendy's, that the Defendant stared forward and looked "very drowsy," that he introduced himself, and that

the Defendant did not respond. Agent Elkins said that he did not question the Defendant about the homicide because the Defendant appeared to be intoxicated and unable to communicate.

Agent Elkins testified that he spoke with the Defendant the following day at the Sevier County Sheriff's Office and that the Defendant was conversational, articulate, lucid, and did not appear to be intoxicated. Agent Elkins stated that he informed the Defendant of her *Miranda* rights and that she voluntarily signed a waiver of rights form. Agent Elkins said that he typed the Defendant's statement as the interview progressed and that the statement was corroborated by evidence found during the investigation and by DNA analysis.

Agent Elkins testified that the interview was lengthy, that the Defendant was permitted to use the restroom and to eat, and that the Defendant never asked to stop the interview. Agent Elkins said that the interview began around 2:00 p.m. and that the Defendant signed her statement after midnight. Agent Elkins stated that he read the statement to the Defendant, that the Defendant had the opportunity to read the statement, and that the Defendant made changes to the statement. Agent Elkins said that the Defendant showed no hesitation in signing the statement. Agent Elkins stated that the Defendant "showed a normal emotion for losing someone that you care about" when speaking about Mr. Phillips's death and that he did not use Mr. Phillips's death to entice the Defendant to give a statement.

On cross-examination, Agent Elkins testified that he was unsure if the circumstances of Mr. Phillips's death caused the Defendant to go into shock, that the Defendant appeared to be intoxicated outside Wendy's, and that based on her statement, he believed the Defendant had been under the influence of methamphetamine. Agent Elkins stated that Mr. Phillips died around 10:00 p.m. and that he arrived at Wendy's about one and one-half hours later.

Campbell County Sheriff's Officer John Long testified that he assisted Agent Elkins in interviewing the Defendant, that he was present when Agent Elkins read the Defendant her *Miranda* rights, and that the Defendant signed a waiver of rights form. Officer Long stated that the Defendant was "lucid" and was "one of the most intelligent people I've [come] in contact with as far as an interview." Officer Long said that the Defendant never requested an attorney and that she was not promised a lesser sentence in exchange for her cooperation. Officer Long stated that the Defendant was given numerous breaks throughout the interview and that she reenacted the homicide while being video recorded after signing her statement.

The Defendant testified that she was arrested on September 13, 2014, after Mr. Phillips was killed. The Defendant stated that she and Mr. Phillips were inside Wendy's for nine hours before police officers located them and that she had been under the influence of methamphetamine.

The Defendant testified that she was sitting beside Mr. Phillips when police officers entered Wendy's and shot Mr. Phillips. The Defendant stated that Mr. Phillips fell on top of her, that she fell on the floor, and that she wrapped her body around Mr. Phillips. The Defendant said that she was very upset and was crying after Mr. Phillips was killed, that she was taken to a hospital, and that she was handcuffed to her hospital bed. The Defendant stated that she was taken to the Sevier County jail after being released from the hospital, that she was not informed why she had been arrested, and that she was not given bail.

On cross-examination, the Defendant testified that she stayed in various motels with Mr. Phillips in the days leading up to her arrest and that she and Mr. Phillips used methamphetamine daily. The Defendant said that she placed a hairbrush in the back of her pants because Mr. Phillips wanted officers to believe they were armed. The Defendant stated that it was possible she told Agent Elkins and Officer Long that Mr. Phillips said he would use the cell phone to look like a weapon if the police entered Wendy's. The Defendant said she had not slept between the homicide and her arrest because she was using methamphetamine, that she "was not impaired to the point where I deserved a public intoxication charge," and that she was "distraught" because of the death of Mr. Phillips.

The trial court denied the Defendant's motion to suppress and found that the evidence did not refute Agent Elkins's belief that the Defendant was intoxicated when he encountered the Defendant outside Wendy's. The court concluded that the arresting officer "left out some salient points but not necessarily salient for . . . public intoxication." The court concluded that the Defendant's "rights had not been abridged for purposes of an illegal detention," when the statement was taken. The court determined that the Defendant was "cogent, she was able to voluntarily and intelligently waive her *Miranda* warnings, and that this statement was well taken." Relative to the issue of bail, the court stated that "the fact that there was no bond placed on this, I mean, that is a – that's not disputed." The court did not make findings as to whether Sevier County's withholding bail rendered the Defendant's detention unlawful. The court also noted that the Defendant would have been subject to an investigatory detention relative to the homicide had she not been arrested for public intoxication.

**Jury Trial**

At the October 4, 2016 jury trial, Michael Raulston testified that he was the victim's stepson, that he had known the Defendant for a few months, and that he had worked previously with the Defendant and the victim at a hardware store. Mr. Raulston stated that the Defendant had visited the victim's house before the date of the homicide and that the victim and the Defendant were friends.

Mr. Raulston testified that he lived in an apartment above the victim's garage, that he saw the Defendant and Mr. Phillips in the victim's home on September 7, 2014, and that he knew Mr. Phillips as "Bryan Tolliver." Mr. Raulston said that the victim left with the Defendant and Mr. Phillips around 5:30 p.m., that the victim did not come home that night or the next day, and that Mr. Raulston called the police to report that the victim was missing. Mr. Raulston testified that the victim owned a red SUV and that he had not seen the SUV in a "week or two."

Sandra Raines, Mr. Phillips's mother, testified that Mr. Phillips began living in a tool shed on her property after his release from prison on parole. Ms. Raines stated that she met the Defendant about three weeks before the victim's murder, that the Defendant "was back and forth in the red SUV for a few days," and that the Defendant was staying overnight in the shed. Ms. Raines stated that Mr. Phillips drove a Nissan truck that he purchased in April or May 2014 and that the truck frequently was not operational.

Ms. Raines testified that she was home on September 7, 2014; that Mr. Phillips, the Defendant, and the victim arrived around 4:00 or 5:00 p.m.; and that she did not recognize the victim. Ms. Raines said that her sister, Lee Ann Winstead, lived in the apartment over her garage and that later in the night Ms. Raines walked outside to speak with Mr. Phillips after having a conversation with Ms. Winstead. Ms. Raines stated that she saw Mr. Phillips's truck parked by the tool shed and that Mr. Phillips walked to the driveway to speak with her. Ms. Raines said that she saw a mattress in the back of the truck, that she asked Mr. Phillips about the mattress, and that Mr. Phillips said he was "hauling it off" because the Defendant bled on it. Ms. Raines said that the Defendant was standing outside the shed and that Mr. Phillips said the victim had left. Ms. Raines stated that she went back in the house, that Mr. Phillips came into her bedroom around 11:30 p.m. to say goodbye, and that she heard Mr. Phillips's truck start.

Ms. Raines testified that she awoke at 8:00 the next morning, that Mr. Phillips was gone, and that Ms. Winstead noticed a tarp on the property. Ms. Raines stated that she lifted the tarp and found the victim's body. Ms. Raines said that the victim's face was covered in blood, that he appeared dead, and that she called the police.

Ms. Raines testified that she saw a photograph of Mr. Phillips and the Defendant on Mr. Phillips's Facebook page on September 13, 2014. A photograph of Mr. Phillips's Facebook page, which reflected the photograph of Mr. Phillips and the Defendant that Ms. Raines saw, was received as an exhibit. Ms. Raines stated that she called the police after she saw the photograph because she knew the police were looking for Mr. Phillips and the Defendant. Ms. Raines said that she learned from a televised news report that Mr. Phillips had been killed in Pigeon Forge.

Anderson County Sheriff's Officer Kory Blevins testified that on September 7, 2014, he saw a Nissan truck parked by the road. Officer Blevins stated that the truck's license plate number was not registered and that according to the the truck's VIN number, Travis Sexton was the registered owner. Officer Blevins said that he saw methamphetamine laboratory components, bloody shoes, a "large quantity" of blood, and a bloody mattress in the back of the truck.

Anderson County Sheriff's Investigator Jeff Gillum testified that he assisted in the investigation of the Nissan truck in the early hours of September 8, 2014. Investigator Gillum stated that he saw a box of ammunition placed on the back bumper and that he saw a bloody mattress, bloody trash bags, and a piece of white plastic covered in blood in the back of the truck. Investigator Gillum said that he saw blood on the bumper, the driver's side door, and the rear of the truck's interior. Investigator Gillum stated that the passenger-side window was down and that he saw blood on the driver's side door panel and steering wheel.

Travis Sexton, the previous owner of the Nissan truck, testified that he sold the truck to Steve Massengill. Jerry Steven Massengill testified that he bought the truck from Mr. Sexton but did not register it or obtain a license plate. Mr. Massengill testified he sold the truck to Mr. Phillips.

TBI Agent James Elkins testified that he searched Ms. Raines's property and the Nissan truck and that he collected evidence and took photographs. Agent Elkins stated that, based on the evidence and the interviews he conducted, Mr. Phillips and the Defendant became suspects in the homicide and that law enforcement began searching for them.

Agent Elkins testified that he did not find evidence of the homicide in Ms. Raines's house or in the apartment over the garage but that inculpatory evidence was found inside and around the tool shed. Agent Elkins stated that bloodstains, bloodstained tape, and tire tracks were observed on the grass near the shed. Agent Elkins said that a daybed frame without a mattress was inside the shed, that he saw bloodstains on the frame, and that bedsheets were hanging around the walls of the shed. Agent Elkins said

-6-

that two "greenish gold velour chairs" were in the shed and that one of the chairs was missing its bottom skirt.

Agent Elkins testified that he found a .22-caliber rifle cartridge casing behind the bedframe and a loaded handgun and ammunition in a cabinet. Agent Elkins said that he found a .22-caliber rifle, "shotgun" ammunition, and a box containing different caliber bullets near the cabinet. Agent Elkins said that a fired cartridge casing was inside the rifle.

Agent Elkins testified that he found a metal clamp, "a duffle bag strap," and a piece of yellow rope on the grass near a piece of "packing tape." Agent Elkins stated that he found another metal clamp and more of the strap and rope in the Nissan truck. Agent Elkins said that he saw a bloodstain and "drag mark[s]" on the grass. A photograph of the victim's body was received as an exhibit, and Agent Elkins stated that the photograph reflected the victim's body "wrapped" in a tarp. Agent Elkins said that "a piece of white corrugated bath board is located underneath his body" and that the bath board appeared to be similar to the plastic found in the truck. Agent Elkins said that he unwrapped the tarp, that the victim's body was covered in blood and maggots, and that he found a "small plastic or polycarbonate lens" on the body. Agent Elkins stated that he found a pair of sunglasses with a missing lens in the truck.

A photograph of the Nissan truck was introduced as an exhibit and reflected that a mattress, a bath board covered in blood, flip-flops, yellow rope, and a metal clamp in the back of the truck. Agent Elkins testified that he found two Walmart receipts in the floorboard of the truck, that the receipts reflected purchases for a box of ammunition and a "12-count box of Nitrile gloves," and that the items were purchased on the day of the homicide. Agent Elkins said that he located the Walmart, that he viewed the store's security video recording, and that the recording showed Mr. Phillips and the Defendant purchasing the ammunition and gloves.

Agent Elkins testified that he found the victim's wallet in a Walmart bag in the bed of the truck and that the wallet contained the victim's driver's license and a Department of Veterans Affairs card. A photograph of a sheet of yellow notebook paper was received as an exhibit. Agent Elkins stated that he found "a piece of yellow notebook paper with writing on it in blue ink" in the victim's wallet. Agent Elkins stated that he found another wallet in a "flowered bag" in the truck and that the bag contained the victim's checkbook, the Defendant's driver's license, and the Defendant's Social Security card. Agent Elkins stated that he found a bottle of bleach, scrub brushes, and paper towels in the bed of the truck. Agent Elkins said that he found a pair of stained Nitrile gloves in a Walmart bag in the bed of the truck and another pair of gloves in the interior of the truck.

Agent Elkins testified that he found a broken cell phone without a battery and a chair skirt covered in blood in the bed of the truck and that the skirt appeared to match the chairs he saw in the tool shed. Agent Elkins stated that he found a pair of pink flip-flops, a pair of orange flip-flops, and a pair of men's black sandals in the truck. Agent Elkins said that he submitted the evidence he collected for DNA analysis.

Agent Elkins testified that Ms. Raines contacted him after she saw a photograph of Mr. Phillips and the Defendant on Facebook, that he determined the photograph was taken at a Wendy's restaurant, and that he took a photograph of the Facebook page. Agent Elkins stated that the Defendant was taken into custody at Wendy's, that she appeared to be intoxicated, and that he did not interview her. Agent Elkins stated that he and Detective Long interviewed the Defendant the next day at the Sevier County Sheriff's Office, that he advised her of her *Miranda* rights, and that the Defendant signed a waiver of her rights. Agent Elkins said that the Defendant spoke clearly and was able to communicate, that he and Detective Long never threatened the Defendant, and that the Defendant consented to providing a sample of her saliva.

Agent Elkins testified that he interviewed the Defendant from 2:00 p.m. to midnight and that the Defendant was given food and periodic breaks. He stated that the Defendant discussed "matters surrounding the killing of [the victim]." He said that he typed the Defendant's statement and that she made corrections. He stated that the Defendant signed the statement and that she initialed the first and last pages. The statement was received as an exhibit, and Agent Elkins read the statement to the jury.

In the statement, the Defendant said that she met Mr. Phillips six weeks before the homicide and that she met the victim while working with him in Knoxville. She stated that on August 25, 2014, the victim loaned his SUV to her and Mr. Phillips to drive to Louisville, Kentucky, to sell methamphetamine. She stated that the victim loaned her and Mr. Phillips his bank card to purchase gas, $260 cash, and a .25-caliber pistol for protection. The Defendant said that on August 29, 2014, the SUV broke down on the way back to Tennessee and that the victim drove to Kentucky to pick her and Mr. Phillips up.

The Defendant stated that after a few days, the victim threatened to report his SUV, bank card, and .25-caliber pistol stolen if his property were not returned. She said that Mr. Phillips became angry at the victim and feared returning to prison. The Defendant stated that Mr. Phillips wanted to have the victim's SUV towed to Tennessee but that it was too expensive.

The Defendant stated that on September 7, 2014, Mr. Phillips told her that if the victim were going to report the property stolen, "then something was going to have to

-8-

happen to him" and that Mr. Phillips said "we could strangle him, cut his throat or shoot him with his own gun to make it look like a suicide." The Defendant said that she did not respond to Mr. Phillips "because it made sense" and that "neither one of us wanted to go to jail." She stated that she and Mr. Phillips went to Walmart to purchase ammunition for the victim's .25-caliber pistol, that the store did not have the ammunition, and that they went to a different Walmart. She said that she and Mr. Phillips bought ammunition for the pistol and gloves "in case [Mr. Phillips] had to kill [the victim] for reporting us." The Defendant stated that "at first, [she] thought [Mr. Phillips] might try to get rid of [her], too, since [she] knew everything."

The Defendant stated that she and Mr. Phillips went to the victim's house, used methamphetamine, and that she, Mr. Phillips, and the victim drove to the tool shed. She said that the victim "thought we were going to [Mr. Phillips's] house to get clothes and stuff we needed" for the trip to Kentucky to retrieve his SUV. The Defendant said that they started using methamphetamine and that "while we were getting high, [Mr. Phillips] kept going outside to get psyched up about killing [the victim]."

The Defendant stated that she and Mr. Phillips could not secure transportation to retrieve the victim's SUV, that Mr. Phillips said "he had to figure something out," and that Mr. Phillips realized the victim's .25-caliber pistol would not fire because of its firing pin. She stated that she told Mr. Phillips "to give [her] a minute to figure something out before [Mr. Phillips] did anything" and that Mr. Phillips kept using methamphetamine to "get up the nerve to kill [the victim]." The Defendant said that Mr. Phillips said "he had to kill [the victim]," that she was "trying figure out another option," and that Mr. Phillips told her to go inside the tool shed with the victim.

The Defendant stated that Mr. Phillips told the victim that his Nissan truck could not make the drive to Kentucky to retrieve the victim's SUV and that Mr. Phillips "had a crazy look in his eyes." The Defendant said that Mr. Phillips went outside to speak with Ms. Winstead and that she sat in the floor in front of the victim. The Defendant said that "at some point without us hearing him, [Mr. Phillips] came back into the shed," that Mr. Phillips was standing behind a sheet hanging from the ceiling, and that she felt the victim "slump over" her back. She stated that she did not recall hearing a gunshot, that the victim's body fell on top of her, and that Mr. Phillips helped her stand. She said that Mr. Phillips pushed the victim's body into the chair, that blood was coming from the victim's nose, and that "it looked like [the victim] was still breathing." The Defendant stated that Mr. Phillips placed the gun to the victim's right ear and pulled the trigger.

The Defendant stated that one of the victim's eyes was still open and that Mr. Phillips told her that "'to ensure culpable responsibility on [her] part,' [she] had to have [her] fingerprints on the gun and a shot had to be fired by [her]." The Defendant said that

she told Mr. Phillips the victim was already dead and that Mr. Phillips told the Defendant she "needed to shoot him anyway." She stated that she placed the gun to the victim's left ear and pulled the trigger but that the victim "didn't bleed at all."

The Defendant stated that Mr. Phillips told her to place the gun next to a bookshelf, that she started "panicking and screaming," and that Mr. Phillips placed his hand over the Defendant's mouth and told her to be quiet. The Defendant said that Mr. Phillips wrapped the victim in a tarp and that he backed up his Nissan truck to the front of the tool shed. The Defendant said that she began cleaning the shed with bleach and a scrub brush and that Mr. Phillips removed $23 in cash from the victim's wallet. The Defendant stated that she threw the victim's wallet into the truck's bed, that Mr. Phillips loaded a bloody mattress in the truck, and that the truck was filled with bloody trash.

The Defendant stated that Ms. Winstead walked to the tool shed and that the Defendant told Ms. Winstead that Mr. Phillips was loading trash into the truck. The Defendant said that Ms. Winstead went in Ms. Raines's home and that Ms. Raines came outside to speak with Mr. Phillips. The Defendant stated that Mr. Phillips told Ms. Raines that he and the Defendant were going to the Defendant's apartment, that Ms. Raines went back in the house, and that Mr. Phillips said they had to leave.

The Defendant stated that Mr. Phillips "crushed" the victim's cell phone with a tire tool and threw the cell phone in his truck. The Defendant said that Mr. Phillips took her cell phone, that he removed the cell phone's battery, and that he placed clothes and a "shower bag" in the truck. She stated that she had blood on her clothes and pink flip-flops and that she placed her pink flip-flops in the bed of the truck. She said that she and Mr. Phillips left to "dump the mattress and trash and the victim's body in the yard."

The Defendant stated that Mr. Phillips's truck broke down on the interstate and that she and Mr. Phillips walked to a nearby motel to rent a room. She stated that she and Mr. Phillips stayed at the motel for two days and that she and Mr. Phillips took a taxi to a hotel in Knoxville. She said that she and Mr. Phillips stayed at the hotel for two nights and that they took a taxi to a hotel in Pigeon Forge.

The Defendant stated that she told Mr. Phillips she was tired of running and that she would take responsibility for the homicide. She said that she and Mr. Phillips began arguing, that she went in the bathroom to take a bath, and that Mr. Phillips pushed her into the bathtub while she was trying to exit it. The Defendant said that Mr. Phillips "took [her] by [her] throat and pushed [her] down on the bed" and that she lost consciousness. The Defendant stated that when she regained consciousness, Mr. Phillips apologized. The Defendant said that "after [they] worked it out, [Mr. Phillips] told her that if he needed to kill [her], he would just [choke her] because he saw how easy it was."

-10-

The Defendant stated that she and Mr. Phillips knew "it was coming to an end" and that they continued using methamphetamine. The Defendant said that she and Mr. Phillips spent the following night in the woods in Pigeon Forge. The Defendant stated that she and Mr. Phillips walked to Wendy's on September 13, 2014. The Defendant said that they sat at a table near three men who they thought were police officers. She said that Mr. Phillips told her to place a hairbrush under her shirt so it would appear she had a gun and that Mr. Phillips said, "'[I]f the cops came to get [them], [she] was to pull the hairbrush, and that would ensure [the cops] shooting [them].'" The Defendant stated that Mr. Phillips was going to "use the phone to look like a gun . . . so that the cops would kill him" and that she did not want the police to kill her.

The Defendant stated that she and Mr. Phillips took a photograph of themselves, that Mr. Phillips posted the photograph on Facebook, and that she and Mr. Phillips stayed at Wendy's for hours because they believed the police were outside. She said that Mr. Phillips began crying and apologizing to her, that she heard police officers instruct them to place their hands in the air, and that Mr. Phillips leaned across her body. She stated that she "grabbed [Mr. Phillips] to try to keep him from grabbing the hairbrush" under her shirt, that she heard one gunshot, and that Mr. Phillips was shot in the head. The Defendant said that Mr. Phillips fell on her, that Mr. Phillips's face was bloody, and that a police officer "threw her to the ground."

Agent Elkins testified that after the Defendant signed the statement, she reenacted the homicide. The recording of the reenactment was introduced as an exhibit and played for the jury. The reenactment was consistent with the Defendant's written statement.

Agent Elkins testified that he and Detective Long traveled to Kentucky to search the victim's SUV and that he found food stamps in the glove compartment bearing the Defendant's name, address, and signature.

On cross-examination, Agent Elkins testified that the Defendant said during the interview that although she loved Mr. Phillips, she feared him and that she thought Mr. Phillips might "get rid of her too." Agent Elkins said that the Defendant spoke freely during the interview and that she provided many details while giving her statement. Agent Elkins said that the Defendant minimized her role in purchasing ammunition from Walmart. Agent Elkins did not know of any physical evidence in the tool shed related to the victim's murder which contradicted the Defendant's statement. Agent Elkins believed the victim was still alive when the Defendant shot the victim.

Walmart employee Donnie Woodrum testified that he provided the September 7, 2014 store recording to the police, which was received as an exhibit and played for the jury. Mr. Woodrum narrated the recording and stated that the recording showed the

Defendant and Mr. Phillips in the sporting goods section and the Defendant's directing an employee to the ammunition case. On cross-examination, Mr. Woodrum testified that Mr. Phillips placed the ammunition on the counter, spoke with the employee, and paid cash for the ammunition and Nitrile gloves.

Wendy's employee Donna Townsend testified that she was working on September 13, 2014 and that she maintained Wendy's surveillance video recordings. A video recording was received as an exhibit and played for the jury. The recording reflected Mr. Phillips and the Defendant entering the restaurant, police officers entering the restaurant, Mr. Phillips being shot, and the Defendant being apprehended.

TBI Special Agent Teri Arney, an expert in firearm identification, testified that the .25-caliber pistol found in the tool shed was inoperable. Agent Arney said that a fired cartridge casing was found inside a .22-caliber rifle and that another cartridge casing was discovered on the floor of the shed. Agent Arney stated that the bullets recovered during the victim's autopsy and from the shed were .22-caliber bullets but that she could not conclusively determine whether the bullets were fired from the rifle because of the damage to the bullets. On cross-examination, Agent Arney testified that another TBI agent analyzed the firearm evidence and that she verified the results of the analysis.

TBI Special Agent Miranda Gaddes, an expert in microanalysis, testified that the lens found wrapped in the tarp with the victim matched the sunglasses found in the Nissan truck.

Dr. Darinka Mileusnic-Polchan, an expert in forensic pathology, testified that she did not perform the victim's autopsy but that she supervised the examining physician. Dr. Mileusnic-Polchan said that when the forensic center received the victim, he was still wrapped in a tarp and was in the early stages of decomposition. Dr. Mileusnic-Polchan stated that blood was smeared on the victim's hair, clothing, and face. Dr. Mileusnic-Polchan determined, based on the report, that gunshot wounds were the cause of the victim's death.

Dr. Mileusnic-Polchan testified that the gunshot wound to the back of the head severed the tissue connecting the brain and the spinal cord, that it would "be eventually a deadly wound," and that it was possible the victim's heart continued beating for several minutes before the victim died. She stated that the bullet which entered the victim's left ear was recovered from the right side of the skull, and she determined that the gunshot wound was fatal. She said that the bullet which entered the victim's right ear was not fatal because it "miraculously avoid[ed] the major vessels in the neck" and that the bullet exited through the front of the victim's neck. She could not determine the amount of time which elapsed between each gunshot or the sequence in which the shots occurred.

-12-

Dr. Mileusnic-Polchan testified that the victim suffered a "thick" bruise on the left side of his forehead under his scalp, that she discovered another minor bruise in the same area of the head, and that neither bruise was associated with the bullets entering the victim's ears. She stated that the thick bruise was an "example of blunt force head trauma," which the victim could have suffered by falling forward and hitting the ground. She said that his heart was beating when he suffered the thick bruise on his forehead.

On cross-examination, Dr. Mileusnic-Polchan testified that the toxicology analysis showed the presence of methamphetamine in the victim's system. She stated that she reviewed the video recording of the Defendant's reenacting the murder and determined that the reenactment was consistent with the wounds. Dr. Mileusnic-Polchan said that the gunshot to the back of the victim's head was fatal, causing instant brain death, and that the victim's heart could have continued beating for "a couple of minutes." She stated that given the location of the gunshot wound, she would have expected to see the victim's eyes flutter, although, "[O]ne is already essentially in the process of dying." She stated that the victim may have appeared dead after the gunshot to the back of the head.

TBI Special Agent Kendall Stoner, an expert in DNA analysis, testified that she received buccal swabs from the Defendant and received blood samples from the victim and Mr. Phillips for analysis. Agent Stoner stated that the .25-caliber pistol contained a mixture of DNA from at least three people and that the major contributor was Mr. Phillips. Agent Stoner said that only the victim's DNA was present on the daybed frame in the tool shed. Agent Stoner stated that the .22-caliber rifle contained a mixture of DNA from at least three people and that the Defendant and Mr. Phillips were the major contributors.

Agent Stoner testified that she analyzed the rubber gloves found in the Nissan truck and concluded that DNA of the major contributor on the inside and outside of the right glove matched Mr. Phillips's DNA and that the minor contributor matched the Defendant's DNA. Agent Stoner said that the outside of the left glove contained a mixture of DNA from Mr. Phillips and the Defendant and that the Defendant was the major contributor of DNA inside of the glove. Agent Stoner analyzed a cell phone and determined that the victim was the major DNA contributor. Agent Stoner said that the analysis of another pair of rubber gloves indicated the presence of DNA but the results were inconclusive. Agent Stoner stated that the victim's DNA was present on two pieces of upholstery.

Agent Stoner testified that the analysis of a pair of pink flip-flops showed the victim as the major DNA contributor and that the victim and the Defendant were the major DNA contributors on a pair of orange flip-flops. Agent Stoner stated that the analysis of a pair of men's black sandals showed that the victim was the major DNA

contributor on the left and right sandals and that the victim, the Defendant, and Mr. Phillips were major DNA contributors on the top of the right sandal.

Upon this evidence, the jury convicted the Defendant of first degree premeditated murder and second degree murder. The trial court merged the convictions, and the Defendant was ordered to serve a life sentence. This appeal followed.

## I. Motion to Suppress

The Defendant contends that the trial court erred in denying her motion to suppress her pretrial statement because she had been detained illegally when she gave her statement. The Defendant argues that a Pigeon Forge police officer obtained an arrest warrant for public intoxication, which failed to include material details regarding Mr. Phillips's death. The Defendant argues that the officer made false representations by withholding material facts surrounding the Defendant's arrest and that the arrest warrant was invalid. The Defendant also asserts that her constitutional rights were violated because she was held without bail, and that as a result, her statement should have been suppressed as fruit of the poisonous tree. The State responds that the court did not err in denying the Defendant's motion because the Defendant failed to establish that her arrest was unlawful and that her statement was involuntary. We conclude that the court properly denied the motion to suppress.

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998); *see State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The trial court's application of the law to its factual findings is a question of law and is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

At the motion to suppress hearing, a copy of the Defendant's arrest warrant was introduced as an exhibit and reflected the following facts supporting her arrest:

> [Pigeon Forge police officer] made contact with [the Defendant] at Wendy's in Pigeon Forge, Tennessee[.] [The officer] noticed [the Defendant] had glassy, watery eyes and would not respond to any questions when asked if she needed medical attention or for her name and birthday.

-14-

[The Defendant] was a danger to herself and others and could not care for herself.

The arresting officer did not testify at the hearing. However, Agent Elkins's testimony at the hearing supported the factual basis stated in the arrest warrant. Agent Elkins testified that he encountered the Defendant outside Wendy's and that she stared forward, and appeared "very drowsy." Agent Elkins said he attempted to speak with the Defendant but that the she was unable to communicate. Agent Elkins stated that he did not interview the Defendant about the homicide at that time because she appeared to be too intoxicated. Furthermore, the Defendant testified at the hearing that she used methamphetamine in the days prior to and on the day of her arrest and that she had not slept for multiple days because of the drug use.

The Defendant argued at the hearing that she was unconstitutionally detained because she was not given bail. Although the trial court did not render findings relative to this issue, the court determined that the Defendant's "rights had not been abridged for purposes of an illegal detention." The court also determined that the Defendant "was able to voluntarily and intelligently waive her Miranda warnings, and [her] statement was well taken." The Defendant does not contest that her statement was voluntary. Even if the Defendant was unconstitutionally held, a confession should not be excluded if the State establishes, as in this case, that the confession was "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *See State v. Dean*, 76 S.W.3d 352, 362 (Tenn. Crim. App. 2001) (quoting *State v. Huddleston*, 924 S.W.2d 666, 674 (Tenn. 1996)). The Defendant has not shown that the trial court erred in denying the Defendant's motion to suppress.

## II. Sufficiency

The Defendant contends that the evidence is insufficient to support her convictions because the victim was already dead when she shot the victim. The State responds that the evidence is sufficient. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are

-15-

resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). A conviction may be based upon circumstantial evidence alone. *See Dorantes*, 331 S.W.3d at 380-381.

Relevant to this case, first degree murder is the unlawful, intentional, and premeditated killing of another. T.C.A. §§ 39-13-201 (2014), 39-13-202(a)(1). In the context of first degree murder, intent is shown if the defendant has the conscious objective or desire to cause the victim's death. *State v. Page*, 81 S.W.3d 781, 790-91 (Tenn. Crim. App. 2002); T.C.A. § 39-11-106(a)(18) (2010) (amended 2011, 2014) (defining intentional as the "conscious objective or desire to engage in the conduct or cause the result"). A premeditated act is one which is

> done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* § 39-13-202(d). The question of whether a defendant acted with premeditation is a question of fact for the jury to be determined from all of the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Proof of premeditation may be shown by direct or circumstantial evidence. *State v. Brown*, 836 S.W.2d 530, 541 (Tenn. 1992).

Second degree murder is defined as a knowing killing of another. T.C.A. § 39-13-210(a)(1); *see id.* § 39-11-106(a)(20) (2014). Second degree murder is a result-of-conduct offense. *Page*, 81 S.W.3d at 787. Therefore, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b) (2014). "[T]he 'nature of the conduct' that causes death is inconsequential." *Page* 81 S.W.3d at 787. A knowing intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93.

"Criminal responsibility, while not a separate crime, is an alternative theory under which the State may establish guilt based upon the conduct of another." *Dorantes*, 331 S.W.3d at 386 (quoting *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)).

> A person is criminally responsible for an offense committed by the conduct of another, if:
>
> . . .
>
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

T.C.A. § 39-11-402 (2014). For a defendant to be convicted of a crime under the theory of criminal responsibility, the "evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386; *see State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994).

We conclude that the evidence is sufficient to support the jury's findings that the Defendant committed first degree premeditated murder and second degree murder. The record reflects that the Defendant and Mr. Phillips discussed killing the victim after the victim threatened to report his SUV, .25-caliber pistol, and bank card stolen. The Defendant's pretrial statement reflects that Mr. Phillips suggested killing the victim and that the Defendant thought killing the victim "made sense" because "neither of us wanted to go to jail." The Defendant and Mr. Phillips purchased ammunition for the victim's .25-caliber pistol and a box of Nitrile gloves on the day of the murder. The Defendant told police officers that she and Mr. Phillips bought the ammunition "in case [Mr. Phillips] had to kill [the victim]." A video recording of the Defendant and Mr. Phillips purchasing the ammunition showed the Defendant directing a Walmart employee to the ammunition.

Mr. Raulston testified that he saw the Defendant and Mr. Phillips in the victim's home on the day of the killing and that the victim left with them about 5:30 p.m. The Defendant's statement reflected that she, Mr. Phillips, and the victim used methamphetamine at the victim's house on the day of the murder and that they drove to the tool shed located on Ms. Raines's property. The Defendant told the police that Mr. Phillips used methamphetamine to "get up the nerve to kill [the victim]" and that she and Mr. Phillips discussed killing the victim outside the shed.

Dr. Mileusnic-Polchan testified that the victim sustained gunshot wounds to the back of the head, the right ear, and the left ear. The Defendant said that Mr. Phillips shot the victim in the back of the head and in the right ear and that she shot the victim in the left ear. Dr. Mileusnic-Polchan stated that the gunshot to the victim's right ear was not fatal, that the gunshot to the victim's left ear was fatal, and that the gunshot in the back of the head was fatal because it severed the victim's brainstem from his spine, resulting in instant brain death. However, Dr. Mileusnic-Polchan stated that the victim's heart could have remained beating for several minutes after the victim was shot in the back of the head and that she could not determine the order of the gunshots. Furthermore, Dr. Milusnic-Polchan stated that the victim suffered a "thick" bruise on the left side of his forehead underneath his scalp and that the victim's blood was still circulating when he suffered the bruise. The Defendant's statement reflected that "it looked like [the victim] was still breathing" after the victim was shot in the back of the head and that one of the victim's eyes were still open after being shot in his right ear. Based on the expert medical testimony, the evidence does not support that the victim was already deceased when the Defendant shot the victim in the left ear.

The Defendant's reenactment of the killing showed that she said that Mr. Phillips shot the victim in the back of the head, that the victim's body fell on top of her, and that Mr. Phillips pushed the victim's body into the chair. The Defendant stated that Mr. Phillips instructed her to shoot the victim and that she shot the victim in the left ear. Dr. Milusnic-Polchan testified that the Defendant's reenactment was consistent with the victim's wounds.

The Defendant assisted Mr. Phillips in cleaning the tool shed and discarding bloody items in Mr. Phillips's truck. The Defendant stated that she told Ms. Winstead during their encounter outside that Mr. Phillips was loading trash in the truck and that she and Mr. Phillips left to "dump the mattress and trash and the victim's body in the yard."

The Defendant's DNA was found on multiple pieces of evidence collected from the tool shed and the truck. The Defendant's and Mr. Phillips's DNA were found on the .22-caliber rifle found in the tool shed. A fired cartridge casing was found in the rifle and another cartridge casing was found on the floor. Bullets for the .22-caliber rifle were found in the shed and during the victim's autopsy. Additionally, the Defendant's, Mr. Phillips's, and the victim's DNA were discovered on multiple pieces of evidence recovered in the truck.

The evidence is sufficient to support the Defendant's convictions for first degree murder and second degree murder based on the Defendant's conduct. We likewise conclude that the evidence is sufficient to support the Defendant's convictions on the alternative theory of criminal responsibility for the conduct of Mr. Phillips because the

-18-

evidence in the light most favorable to the State supports that the Defendant knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission. The Defendant is not entitled to relief on this basis.

### III. Election of Offenses

The Defendant contends that the trial court erred by failing to require the State to make an election of the offenses because "[b]y putting the Defendant to trial on charges of First Degree Murder, and failing to elect which of the theories within each count that the Defendant was accused of violating, the indictment should have been rendered invalid, as it in effect charges separate offenses in the disjunctive." The State contends that the trial court did not err because no election was required. We agree with the State.

When evidence is presented of multiple offenses that would fit the allegations of the charge, the State must elect the particular offense for which a conviction is sought, and the trial court must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. *See, e.g., State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1988); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). "The purpose of election is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask a conviction, then the court cannot be assured of a unanimous decision." *State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993).

At the pretrial motion hearing, trial counsel requested that the State provide an election of offenses "for the purposes of [jury] unanimity." The trial court denied the Defendant's motion and stated that "[election of offenses] is always a live issue, so if it becomes clear that the State can and should elect a theory, the Court will entertain that motion once again[.]"

At the trial, trial counsel once again raised this issue and argued that the State should elect whether it was proceeding on the theory that the Defendant was the principal actor in killing the victim or whether the Defendant was criminally responsible for Mr. Phillips's killing the victim. The Defendant asserted that if the State did not elect a theory, the jury would not reach a unanimous verdict. The State responded that it was not required to elect only one theory and that a general unanimity charge was sufficient. The trial court denied the Defendant's request for an election of theories.

Our supreme court has held that "a separate indictment for criminal responsibility is unnecessary when a defendant has been indicted for the primary offense." *Sherman*, 266 S.W.3d 395, 408 (Tenn. 2008) (citing *Lemacks*, 996 S.W.2d at 170). The record reflects that the Defendant was indicted for the primary offenses of first degree

premeditated murder and first degree felony murder and that the Defendant was given adequate notice of the charges. Criminal responsibility is not a "separate and distinct crime; rather, it works in synergy with the charged offense to establish a defendant's guilt through the conduct of another." *Sherman*, 266 S.W.3d at 408. An indictment is not void for failing to reference a theory of criminal responsibility because "an indictment that charges an accused on the principal offense 'carries with it all the nuances of the offense,' including criminal responsibility." *Lemacks*, 996 S.W.2d at 173 (quoting *State v. Johnson*, 910 S.W.2d 897, 900 (Tenn. Crim. App. 1995)). The trial court properly determined that an election of offenses was unnecessary.

## IV. Bill of Particulars

The Defendant contends that the trial court erred by denying her request for a bill of particulars because the "indictment contained only conclusory statements and lacked sufficient particularization" as to the alleged conduct of the Defendant's guilt. The Defendant asserts that she was unable to prepare an adequate defense because the State was permitted to argue simultaneously that the Defendant was the principal actor in the killing and was criminally responsible for Mr. Phillips's conduct. The State responds that the court properly denied the motion because the State was clear at the pretrial motion hearing that it intended to present alternate theories of "premeditated first degree and felony murder based upon the [D]efendant and Mr. Phillips's joint actions of planning, robbing, and killing [the victim]." The State argues that the Defendant had notice of the crimes with which she was charged and had an opportunity to prepare an adequate defense for the trial.

Tennessee Criminal Procedure Rule 7(c) states that upon a "defendant's motion, the court may direct the district attorney general to file a bill of particulars so as to adequately identify the offense charged." A bill of particulars serves to provide information about the details of the charged offense, if such information is necessary to prepare a defense, to prevent "prejudicial surprise" at a trial, and to protect a defendant against double jeopardy. *Sherman*, 266 S.W.3d at 408-09; *see State v. Speck*, 944 S.W.2d 598, 600 (Tenn. 1997); *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991); *State v. Hicks*, 666 S.W.2d 54, 56 (Tenn. 1984). However, a bill of particulars is limited to information needed to defend against the allegations contained in the indictment, not a tool used for discovery. Tenn. R. Crim. P. 7(c), Advisory Comm'n Cmts.

Prior to the trial, the Defendant filed a motion to require the State to furnish information regarding (1) whether the State alleged that the Defendant fired the shot that killed the victim, (2) whether the State alleged that Mr. Phillips fired the shot that killed the victim but that the Defendant was criminally responsible based upon her conduct, and

(3) whether the State alleged Mr. Phillips killed the Defendant, and if so, what specific acts the Defendant committed causing her to be culpable for the death of the victim.

At the pretrial motion hearing, trial counsel argued that the State should be required to disclose whether the State would allege at the trial that the Defendant was the principal actor in the killing or whether the Defendant was criminally responsible for Mr. Phillips's killing the victim. Counsel argued that the State was proceeding on two separate theories and that each theory required a different defense at the trial. The State responded that they intended to present evidence supporting both theories at the trial and that the indictment provided the Defendant with adequate notice of the charges. The trial court determined that the Defendant was not entitled to a bill of particulars because the State was permitted to proceed on both theories of culpability.

The record supports the trial court's denial of the Defendant's motion for a bill of particulars. The State was properly permitted to prosecute the Defendant under alternate theories of responsibility. *See Lemacks*, 996 S.W.2d at 173. Furthermore, the State was clear at the pretrial motion hearing that it intended to present evidence supporting alternative theories of responsibility, and we conclude that the Defendant was given adequate notice to prepare a defense prior to the trial. The Defendant is not entitled to relief on this basis.

## V. Admissibility of Evidence

The Defendant contends that the trial court erred by admitting a photograph of Mr. Phillips's alleged Facebook page and a photograph of a yellow sheet of notebook paper, which the parties refer to as a "ledger" in their appellate briefs, into evidence because they both contained hearsay and were not properly authenticated. The State responds that the court properly admitted both into evidence.

"Admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). Evidence must be first be authenticated before it can be admitted. Tennessee Rule of Evidence 901 states that authentication "is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." "A trial court has broad discretion regarding the admissibility of photographs." *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). "Before a photograph is admissible, it must be verified and authenticated by a knowledgeable witness." *State v. Davidson*, 509 S.W.3d 156, 198 (Tenn. 2016); *see Banks* 564 S.W.2d 949.

-21-

Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A trial court's factual findings and credibility determinations relative to a hearsay issue are binding upon an appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The determination of whether the statement in question is hearsay and whether a hearsay exception applies are questions of law that are reviewed de novo. *Id.*

## A. Facebook Page Photograph

At the trial, the photograph of Mr. Phillips's purported Facebook page was admitted into evidence, after trial counsel objected. In a jury-out hearing, the following exchange occurred:

THE COURT: . . . [W]ould you outline your basis for introduction of this exhibit?

[THE STATE]: Your Honor, this is something that [Ms. Raines] sat in her own home, personally observed, recognized as [Mr. Phillips], that she recognized the [Defendant with Mr. Phillips]. Our next line of questioning would be – would proceed that based upon seeing this, she called law enforcement, alerted law enforcement to what had been posted. Law enforcement, in turn, was able to determine the location that this came from, and that's what alerted the law enforcement authorities in Pigeon Forge to begin looking. And your Honor, if I may direct your attention, slightly above and behind them is a photograph that is identifiable as being in Wendy's . . . that's how [the police] determined that [the Defendant and Mr. Phillips] were at a Wendy's restaurant in Pigeon Forge. So, that photograph is a very critical link to everything that took place here including the arrest and apprehension of [the Defendant] at that location.

THE COURT: [Trial Counsel]?

[COUNSEL]: It's just not been . . . properly authenticated. You can't just take things off the Internet and enter them as evidence in Court. First of all, if they're trying to enter that as a photograph, the photograph itself has to be authenticated. Ms. Raines can't testify that that's a fair and accurate depiction of what happened there in Wendy's, she wasn't there at Wendy's. . . . There are things that have to be done to authenticate things. The State hasn't done that, and they can't do that with this witness. We would object.

-22-

THE COURT: As I understand it, though, the State is not trying to authenticate that he's necessarily at Wendy's, he's trying to go through this witness – this is what [s]he saw – what [Ms. Raines] saw on the Internet. And based upon what she saw on the Internet, she made certain phone calls, made certain assumptions, right or wrong. . . .

. . .

[COUNSEL]: That may be something [Ms. Raines] can testify to, your Honor, and it may be relevant, but that doesn't make that document admissible.

THE COURT: Okay. How is it inadmissible?

[COUNSEL]: It's not authenticated.

. . .

[THE STATE]: Your Honor, authentication comes in under Rule 901, and one of the ways that it can be authenticated is through testimony of a witness with knowledge that evidence is what it is claimed to be. It's 901(b)(1).
THE COURT: The authentication process is not that [Mr. Phillips] was in Wendy's it is what [Ms. Raines] sees. . . . I have no problem with [Ms. Raines] authenticat[ing] this as what she saw on the Internet. Is that what I heard?

[THE STATE]: Yes, your Honor[.] . . .

THE COURT: Okay. . . . I'm going to find, first of all, the first prong is met authentication is shown. . . .

. . .

[COUNSEL]: If the State's offering this picture for that purpose, I would ask that it be limited to that picture. I don't know that any of the rest of it is relevant. There's other pictures of [Mr. Phillips] on here, there is information about him, says he's a student at Roane State, lives in Caryville. I mean, if the State wants to enter it – discuss those things, they need to enter it through other means, not just dump this document and let the –

-23-

THE COURT: What is the relevance of the other information on your purported exhibit?

. . .

[THE STATE]: Your Honor, that's what permits the authentication. If we isolated that one photograph, she could not look at it and identify it. It's her viewing that in the context of a Facebook post that says she recognizes that, that she specifically remembers seeing that on September 13. That's what she saw, the whole thing. . . .

THE COURT: But then we start getting into hearsay at some point. I mean, authentication is one point, then you roll into hearsay, and I'm not saying it is. I'm saying that we need to discuss the relevance, first of all, of that, and is there hearsay information on that that is offered to prove the truth of the matter asserted.

[COUNSEL]: There are statements, ["]I love you, please don't do this["] . . . there's a statement, ["]when is the funeral["] . . .

. . .

THE COURT: Well, you know, rather than get into a huge intellectual exercise on this thing, let's get it back to is it properly authenticated, yes. Is it relevant, we're still talking about that. Is – are there hearsay items on here[?] You mentioned the [statement] . . . ["]I love you, please don't do this["]. I don't see that as being offered to prove the truth of the matter of anything. And neither is the, ["]when funeral["]. The question is almost never hearsay. I'm just [going to] make a call on this, and I'm [going to] admit the – I'm [going to] admit the introduction of this photograph provided this witness is the proponent of the exhibit and – period.

The record supports the trial court's determination that the photograph of Mr. Phillips's purported Facebook page did not contain hearsay. Ms. Raines testified that she saw a photograph of the Defendant and Mr. Phillips on Mr. Phillips's Facebook page on September 13, 2014. The photograph introduced by the State was a depiction of Mr. Phillips's purported Facebook page, which included a photograph of the Defendant and Mr. Phillips, additional comments under the photograph, and other photographs and general information that were not relevant in this case. The comments and general information that were visible on the photograph of the purported Facebook page were not

offered to "prove the truth of the matter asserted." *See* Tenn. R. Evid. 801(c). The photograph was admitted to show what caused Ms. Raines to call the police and how the Defendant and Mr. Phillips were found. Ms. Raines's testimony properly authenticated the photograph as a depiction of the Defendant and Mr. Phillips. We decline to review whether Ms. Raines's testimony properly authenticated Mr. Phillips's purported Facebook page. The Defendant is not entitled to relief on this basis.

## B. Ledger

The Defendant objected at the trial prior to the admission of a photograph of a sheet of yellow notebook paper and argued that the paper was not properly authenticated and contained inadmissible hearsay. The following exchange occurred in a jury-out hearing:

THE COURT: Could I see the photograph?

[THE STATE]: Yes, your Honor.

THE COURT: All right. I've reviewed the photograph. Your objection is based on?

[COUNSEL]: Well, your Honor, it's hearsay. There's been no authentication. There is no way to – as far as we're aware of, this witness certainly has no way of authenticating it or in any other way vouching for its authenticity other than I imagine he would say that he found it, but it's clearly hearsay. . . .

. . .

[THE STATE]: This is an item that was inside the wallet of [the victim]. That photograph has been introduced, and the wallet itself and its original contents are here for submission as well.

. . .

THE COURT: Without a declarant, we can't necessarily say it was hearsay so the question becomes its relevance. And what relevance do you say this has?

-25-

[THE STATE]: It's relevant, your Honor, because it corroborates the statements made by [the Defendant] to [Agent Elkins] concerning the dates and events that are recorded on this document.

. . .

[COUNSEL]: If we could – just two brief things to respond to. First of all, it's obviously offered for its content. It's not offered as some, you know, meaningless piece of paper that was recovered by this agent. Secondly, we would just ask the Court to realize that because we don't know who the declarant is does not mean that it's not hearsay.

. . .

[THE STATE]: The only testimony is [going to] be where it was found.

. . .

THE COURT: Okay. Let me make my ruling and then we'll argue about that down the line, but I'm [going to] find that it's relevant for now, it will be admitted into evidence, and then what we do with it is subject to an entirely different discussion.

Agent Elkins testified that he found "a piece of yellow notebook paper with writing on it in blue ink" in the victim's wallet. No further testimony or evidence was introduced relative to the paper. During closing arguments, the State asserted that the paper was a "ledger" and that it proved the Defendant owed the victim money.

In order for a handwriting to be admitted into evidence, it must first be properly authenticated. We note that the exhibit is not a self-authenticating document. *See* Tenn. R. Evid. 902. "Unless the writing is self-authenticating pursuant to rule 902, testimony must be presented by an individual with personal knowledge that the particular writing or record meets the requirements of this rule." *State v. Edward Lee Adkins*, M2009-200528-CCA-R3-CD, 2010 WL 3489170, at \*2 (Tenn. Crim. App. Aug. 25, 2010). The State failed to prove that the paper was a "ledger" because no witness with knowledge testified as to the paper's contents. The State was improperly permitted to argue that the paper's contents proved the Defendant owed the victim money because no evidence was presented to the jury during the trial to prove that the paper was a "ledger." Furthermore, the State failed to present either a handwriting expert or layperson familiar with the victim's handwriting to testify that the victim was the author of the paper. *See* Tenn. R. Evid. 901(b)(2); 901 (b)(3). As such, the paper was not properly authenticated and was

not relevant at the trial. The court erred by admitting the paper in evidence. However, we conclude that the error was harmless because the remaining evidence was sufficient to support the Defendant's convictions.

## VI. Jury Instructions

The Defendant contends that the trial court improperly instructed the jury regarding criminal responsibility for first degree premeditated murder and first degree felony murder because the indictment did not specify that she was criminally responsible for Mr. Phillips's conduct. *See* T.C.A. §§ 39-13-202, 39-11-402. The Defendant asserts that the trial court erred by denying her request for an instruction for the definition of "aids" as it is used in the criminal responsibility jury instruction. The State responds that the Petitioner has waived appellate review of this issue because she failed to include the jury instructions in the appellate record. Alternatively, the State responds that the court did not err during jury instructions.

As the State notes, the record does not contain the jury instructions. Although the trial transcript includes the preliminary jury instructions, it does not include the instructions that were given to the jury. The Defendant has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal. *See, e.g., State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983); *see* T.R.A.P. 24(b). "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue." *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). Likewise, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars." *Id.* (citing *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981); *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983)); *see State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993). Appellate review of this issue is waived because the Defendant failed to prepare an adequate record.

## VII. Cumulative Error

The Defendant contends that due process compels a new trial because of the existence of cumulative error. The concept of cumulative error is that multiple errors, though harmless individually, cumulatively violate a defendant's right to a fair trial. *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010). We have found but one error pertaining to the admission of the alleged ledger, which we have determined was harmless. With only one error, multiple errors do not exist. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE